OPINION
{¶ 1} Appellant, Juan Torres-Flores, appeals from the trial court's entry of judgment on a jury verdict convicting him on one count of gross sexual imposition.
 {¶ 2} On the evening of May 6, 2004, the victim, who was 12 years old at the time, and her two younger sisters, visited their neighbor, Dionne Carotenuto ("Dee Dee"). The victim had previously received consent from her mother, Michelle Martin ("Michelle"), to spend the evening at Dee Dee's to help watch her children.[1] When the victim and her sisters arrived at Dee Dee's, there were four adults and numerous children. Later, appellant, a close friend of Dee Dee and her boyfriend ("Edgar"), arrived at the residence. Appellant knew everyone at Dee Dee's, including the victim, who referred to appellant as "Condi." Dee Dee indicated appellant spent most of the night outside her apartment drinking beer and conversing with two women.[2]
 {¶ 3} Around 10:00 or 10:30 p.m., some of the children complained they were hungry so Edgar left to get them cheeseburgers. By the time Edgar returned, the children were sleeping. According to Dee Dee, many of the children arose to eat; however, the victim remained in a deep sleep on the floor. At approximately 10:45 p.m., Dee Dee noticed Michelle had returned from a date with her boyfriend. Dee Dee testified she met Michelle outside and indicated her daughters were asleep in the apartment. Dee Dee testified she wished Michelle to retrieve the three girls; however, according to Dee Dee, Michelle stated, "It's okay, let them sleep." Dee Dee did not object.
 {¶ 4} Dee Dee returned to her apartment, sat on the couch with Edgar and watched television from 11:00 p.m. until 2:00 a.m. According to Dee Dee, the children were sleeping soundly and, to her recollection, did not awaken. At 2:10 a.m., before she went to bed, Dee Dee checked on appellant, who was still outdoors with the two women. Appellant indicated he was going to stay up with the women. Dee Dee then went to bed.
 {¶ 5} According to the victim, she did not plan on spending the night at Dee Dee's home. She testified she was tired and simply fell asleep on Dee Dee's floor. At around 1:00 a.m., the victim stated she woke up and retrieved a tissue from Dee Dee's bathroom after which she again fell asleep. However, some time later, the victim woke up after feeling someone touching or rubbing her back. She testified she remained still because she was frightened. However, the touching soon descended from the victim's back to her buttocks. After reaching her buttocks, she felt a sudden squeeze. Alarmed, the victim turned around and observed appellant lying behind her. According to the victim, appellant smelled of beer and, upon being noticed, advised the victim to "give [him her] hand." The victim testified she stood up and told appellant she was leaving. At trial, the victim elaborated:
 {¶ 6} "I told him I was going to leave because I was sick and he said, told me to leave my sisters there and I said no. Then he told me that my mom wouldn't be home."
 {¶ 7} The victim left the apartment with her sisters, ran directly home, and told Michelle what had transpired. Michelle Martin testified, she immediately went to Dee Dee's apartment and confronted appellant, who ran away. Michelle stated she tried to awaken Dee Dee and Edgar but was unsuccessful. After returning to her apartment, she phoned the police.
 {¶ 8} Members of the Painesville Police Department arrived at the Martin residence sometime after 3:00 a.m. on May 7, 2004. The officers took a brief statement from the victim and Michelle who were visibly upset. The officers then walked to Dee Dee's apartment and found appellant sleeping on the floor. The two women were also present. Dee Dee and Edgar spoke with police and indicated they were unaware that anything unusual happened in their home. However, later the same day, appellant was arrested.
 {¶ 9} On May 8, 2004, appellant was indicted on one count of gross sexual imposition, in violation of R.C. 2907.05(A)(4), a felony of the third degree. Appellant's jury trial began on January 4, 2005 and on January 5, 2005, appellant was convicted of the charge. On February 16, 2005, appellant was ordered to serve six months in the Lake County Jail and placed on two years of community control.
 {¶ 10} Appellant appeals and asserts one assignment of error:
 {¶ 11} "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."
 {¶ 12} When reviewing whether a verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and reasonable inferences, and consider the credibility of witnesses. State v. Group, 98 Ohio St.3d 248,2002-Ohio-7247, ¶ 77. We then decide whether, in resolving conflicts in the evidence, the jury clearly lost its way such that justice requires a new trial. Id. However, our discretionary power to grant a new trial will be exercised only in those exceptional cases where the evidence weighs heavily against the conviction. State v. Cole, 11th Dist. No. 2003-L-152,2005-Ohio-1800, at ¶ 9.
 {¶ 13} In the instant matter, appellant was convicted of gross sexual imposition under R.C. 2907.05(A)(4). The statute reads:
 {¶ 14} "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender; to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
 {¶ 15} "(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."
 {¶ 16} R.C. 2907.01(B) defines sexual contact as, "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."
 {¶ 17} In support of his manifest weight argument, appellant argues that several of the factors set forth in State v.Mattison (1985), 23 Ohio App.3d 10 were not met. In particular, appellant maintains the victim's testimony was inconsistent with her testimony at the preliminary hearing and her statement taken by police subsequent to the incident in question. Appellant further notes the victim's testimony was, in part, inconsistent with two defense witnesses, Dionne Carotenuto and Sandy Lohr.
 {¶ 18} In Mattison, the Eight Appellate District held:
 {¶ 19} "In determining whether the decision of a trial court is against the manifest weight of the evidence, the following factors are guidelines to be taken into account by the reviewing court"
 {¶ 20} "1. The reviewing court is not required to accept as true the incredible;
 {¶ 21} "2. whether the evidence is uncontradicted;
 {¶ 22} "3. whether a witness was impeached;
 {¶ 23} "4. what was not proved;
 {¶ 24} "5. the certainty of the evidence;
 {¶ 25} "6. the reliability of the evidence;
 {¶ 26} "7. whether a witness' testimony is self-serving;
 {¶ 27} "8. whether the evidence is vague, uncertain, conflicting or fragmentary." Id. at syllabus (Emphasis sic).
 {¶ 28} According to appellant, when viewed in light of theMattison factors, the verdict is against the manifest weight of the evidence.
 {¶ 29} We first acknowledge the Mattison factors are helpful guides when exploring whether a verdict is against the weight of the evidence. However, we have previously held the factors are merely guidelines to be considered when weighing the evidence and they do not create a specific standard to be applied to manifest weight claims. State v. Krug, 11th Dist. No. 2000-L-108, 2002-Ohio-2108, at ¶ 22, citing State v. Harris
(Apr. 10, 1998), 11th Dist. No. 96-T-5512, 1998 Ohio App. LEXIS 1540 at 7-8. With this in mind, we turn to the substantive features of appellant's challenge.
 {¶ 30} First, appellant draws our attention to specific inconsistencies between the victim's and Dee Dee's testimony. During direct examination, the victim testified she spent the evening at Dee Dee's apartment because Dee Dee asked her if she could help babysit her two eldest children while she was cooking. Alternatively, Dee Dee testified she did not ask for the victim's assistance in watching the children because she was at home and a sitter was unnecessary. Although both provided a competing characterization for why the victim was present at Dee Dee's on the evening in question, we do not see how this distinction impacts the ultimate issue of appellant's guilt.[3] In the context of the entire case, the foregoing testimonial difference is negligible. In any event, such basic credibility determinations are properly within the jury's province.
 {¶ 31} Next, appellant addresses certain inconsistencies between the victim's testimony at trial and her testimony at the preliminary hearing. First, during trial, the victim testified she woke up at approximately 1:00 a.m. to retrieve a tissue to blow her nose. The victim indicated, before she fell back to sleep she observed Dee Dee sitting in the living room watching television. This testimony was consistent with the victim's written statement to the Painesville Police Department which was taken the morning after the incident took place. However, at the preliminary hearing, the victim testified she woke at 3:00 a.m.
 {¶ 32} Although there is some confusion regarding the time the victim woke up to blow her nose, the inconsistency does not undermine the verdict when the evidence is viewed in its totality. That is, the victim testified she awoke twice during the night. First, she awoke spontaneously to obtain a tissue, which, according to her testimony, occurred around 1:00 a.m. Second, the victim testified she was awoken because she felt "somebody touching [her] back." The victim testified she remained still until "he went down further on to [her] bottom. Just kept his hands there. Then he squeezed it and then [she] jumped up." While the temporal specifics may be facially inconsistent, the inconsistency can be reconciled through the victim's own testimony that she woke up twice.
 {¶ 33} Appellant's next argument concerns the victim's testimony regarding whether appellant "squeezed" or "rubbed" her buttocks. At the preliminary hearing, the victim testified appellant "rubbed" her bottom, while at trial, she testified he "squeezed" her bottom. We first observe that, for purposes of appellant's conviction, the quality of the "sexual contact" matters little. Gross sexual imposition requires sexual contact of an erogenous zone (the buttocks). Accordingly, it is inconsequential whether appellant "squeezed" or merely "rubbed" the victim's buttocks as proof of either is sufficient to meet the sexual contact prong of the gross sexual imposition charge.
 {¶ 34} That said, appellant's argument directs our attention to a mere semantic inconsistency. To be sure, the victim's testimony at trial characterized the alleged contact in a qualitatively different term than that to which she testified at the preliminary hearing. However, defense counsel effectively cross-examined the victim on this matter and thus the jury was privy to the inconsistency. However, we do not believe the jury lost its way when it convicted appellant in light of this inconsistency.
 {¶ 35} Appellant next draws our attention to contrasts in the victim's testimony regarding the direction in which she was sleeping on the night of the alleged incident. At trial, the victim stated she was resting on her right side; however, during the preliminary hearing, she testified she was lying on her left side. When confronted with this competing testimony, the victim testified "she got confused" during the preliminary hearing. Again, the jury heard this inconsistency and still determined appellant was guilty of the charged offense. We do not believe the jury clearly lost its way in doing so.
 {¶ 36} Next, appellant points out the victim's police report indicated she was touched over the clothing. The victim testified similarly at the preliminary hearing; however, during cross-examination, the victim testified appellant touched her bare skin. When questioned about the inconsistency, the victim indicated she could not explain the conflict. While an ostensible inconsistency, the state rehabilitated the victim on re-direct with the assistance of the preliminary hearing transcripts:
 {¶ 37} "Q. * * * Just tell us line by line what the questions and answers were on that whole page there.
 {¶ 38} "* * *
 {¶ 39} "A. `Are you okay for me to ask a couple more questions? Then we will be done; all right? All of the touching occurred above — I shouldn't say `above,' but did he ever reach insider of your clothing?'
 {¶ 40} "Q. And you answered?
 {¶ 41} "A. `No.'
 {¶ 42} "Q. Then the next question.
 {¶ 43} "A. `Did he ever actually touch your skin?' `Yes.'
 {¶ 44} "Q. And you answered?
 {¶ 45} "A. `Yes.'
 {¶ 46} "Q. What was the next question?
 {¶ 47} "A. `What part of your skin did he touch?'
 {¶ 48} "Q. How did you answer?
 {¶ 49} "A. `He touched my back. He lifted up my shirt whilehe was rubbing underneath.'" (Emphasis added.)
 {¶ 50} The victim's preliminary hearing testimony reveals she was touched both over her clothing and on her skin. We therefore believe there is no necessary inconsistency in her testimony on this matter.
 {¶ 51} Appellant next directs our attention to certain facts developed at trial which were omitted from the victim's original police statement or her preliminary hearing testimony. As a whole, we do not believe the omissions or testimonial conflicts impacted the victim's credibility so greatly as to render her testimony unbelievable. In fact, she testified her statement and testimony were accurate despite the omissions. Defense counsel cross-examined the victim on the omitted details and the jury still chose to convict appellant. Given the evidence, we do not believe the verdict improper.
 {¶ 52} Appellant's argument is directed, almost exclusively, at the victim's credibility and the believability of her testimony in light of various alleged inconsistencies. Defense counsel underscored the credibility issues surrounding the victim's testimony at trial. The defense also offered alternative, if not far fetched, explanations as to why the victim might fabricate the allegations.[4] However, after hearing all the evidence, the jury found the victim's version of events believable and trustworthy.
 {¶ 53} After reviewing the record, we hold appellant's arguments, viewed individually as well as collectively, do not merit a reversal. When the evidence is observed in its full scope, we believe the state met both its burden of production and persuasion such that the jury did not clearly lose its way in convicting appellant. That is, the state put forth sufficient, credible evidence for the jury to find appellant guilty, beyond a reasonable doubt, of gross sexual imposition. We therefore believe the jury's verdict is supported by the weight of the evidence and thus appellant's sole assignment of error is without merit.
 {¶ 54} For the foregoing reasons, appellant's sole assignment of error is overruled and the judgment of the Lake County Court of Common Pleas is hereby affirmed.
Diane V. Grendell, J., Colleen M. O'Toole, J., concur.
[1] At trial, Dee Dee denied seeking the victim's assistance babysitting; however, she did testify the victim frequently visited her apartment and played with her children.
[2] The two women,"Adriana" and "Berenice," were temporarily staying with Dee Dee and Edgar.
[3] In fact, Dee Dee testified the victim frequently came over to play with her children under circumstances in which she would not necessarily be considered a "babysitter." Consequently, the victim's presence at Dee Dee's residence was common and somewhat unremarkable.
[4] The defense asserted appellant spurned Michelle Martin's advances and thus the victim, as a way of vindicating her mother, contrived the allegations. Michelle Martin denied having a romantic interest in appellant. The defense alternatively contended the victim was a depressed child because her mother did not provide her with adequate attention. Accordingly, the victim concocted the allegations to garner more of her mother's attention. The victim denied experiencing depression or possessing any emotional imbalance.